Michael Louis Kelly - State Bar No. 82063
mlk@kirtlandpackard.com
Behram V. Parekh - State Bar No. 180361
bvp@kirtlandpackard.com
Joshua A. Fields - State Bar No. 242938
jf@kirtlandpackard.com
KIRTLAND & PACKARD LLP
2041 Rosecrans Avenue, Third Floor
El Segundo, California 90245
Telephone: (310) 536-1000
Facsimile: (310) 536-1001

*Counsel for Plaintiff Dale Miller,
John F. Barton, Jr., and all others
similarly situated.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DALE MILLER and JOHN F. BARTON, JR., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>METLIFE, INC., a Delaware Corporation; METROPOLITAN LIFE INSURANCE COMPANY, a New York Corporation; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>1. **BREACH OF CONTRACT**<br>2. **FRAUD**<br><br>**JURY TRIAL DEMANDED** |

99003-00001  173752.01

COMPLAINT

Plaintiffs DALE MILLER ("MR. MILLER") and JOHN F. BARTON, JR. ("MR. BARTON"), on behalf of themselves and all others similarly situated, allege the following:

## JURISDICTION AND VENUE

1. This Court has diversity jurisdiction over this class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005 because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the class are citizens of different states than the Defendants. *See* 28 U.S.C. § 1332(d)(2)(A).

2. This Court also has personal jurisdiction over Defendants because Defendants are authorized to do business, and currently do business, in this state.

3. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because Defendants METLIFE, INC. and METROPOLITAN LIFE INSURANCE COMPANY have conducted business in this District and are subject to personal jurisdiction and a substantial portion of the conduct complained of herein occurred in this District.

## PARTIES

4. Plaintiff, MR. MILLER, at all relevant times herein, was and is a citizen and resident of the State of California. MR. MILLER entered into a contract with METLIFE, INC. and METROPOLITAN LIFE INSURANCE COMPANY (hereafter, collectively referred to as "MET LIFE" or "Defendants") on or about March 22, 2000, when he accepted MET LIFE's offer for a Group Variable Universal Life (GVUL) policy.

5. Plaintiff, MR. BARTON, at all relevant times herein, was and is a citizen and resident of the State of Colorado. MR. BARTON entered into a contract with MET LIFE in or about March 2000, when he accepted MET LIFE's offer for a GVUL policy.

6. Defendant METLIFE, INC. is a Delaware corporation, with its corporate

headquarters located in the State of New York. METLIFE, INC. also conducts a substantial amount of business nationwide, including in California.

7. Defendant METROPOLITAN LIFE INSURANCE COMPANY is a New York corporation, with its corporate headquarters located in the State of New York. METROPOLITAN LIFE INSURANCE COMPANY also conducts a substantial amount of business nationwide, including in California.

8. Plaintiffs are unaware of the true names and capacity of the defendants sued as DOES 1-10, and therefore sue these defendants by fictitious names. Plaintiffs will seek leave to amend this Complaint when and if the true identities of these DOE defendants are discovered. Plaintiffs are informed and believe and thereon allege that each of the defendants designated as a DOE is responsible in some manner for the acts and occurrences alleged herein, whether such acts or occurrences were committed intentionally, negligently, recklessly or otherwise, and that each said DOE defendant thereby proximately caused injuries and damages to Plaintiffs and the Class as herein alleged, and is thus liable for Plaintiffs' and the Class's injuries.

9. At all times herein mentioned, Defendants, and each of them, were the agents, principals, servants, employees, and subsidiaries of each of the remaining Defendants, and were at all times acting within the purpose and scope of such agency, service, and employment, and directed, consented, ratified, permitted, encouraged, and approved the acts of each remaining defendant.

## PRELIMINARY ALLEGATIONS

10. This action arises out of MET LIFE's practice of improperly charging certain of their non-smoking insureds smoker rates, which are higher than non-smoker rates, for their life insurance premiums, when the insureds did not enroll as smokers.

11. MR. MILLER is currently a commercial airline pilot with United Airlines ("United"), and he has been employed as a pilot with United since 1990. MR.

MILLER is also a member of the Airline Pilots Association (hereafter "ALPA"), the union for airline pilots with United.

12. As a pilot with United, MR. MILLER received several employee benefits including group rates on insurance services being offered by MET LIFE. MR. MILLER has taken advantage of these benefits after he first became employed with United in 1990 and has maintained some form of life insurance with MET LIFE, throughout his employment there.

13. When MR. MILLER first enrolled for life insurance services with MET LIFE, he was enrolled in either an Optional Term Life insurance (OTL) program or a Group Universal Life policy (GUL) program. In the event MET LIFE has asked MR. MILLER his status as a smoker or non-smoker, he would have indicated non-smoker status, as MR. MILLER has always been a non-smoker during the applicable periods, including the five-year look back periods.

14. In or about March of 2000, MR. MILLER received notice that his life insurance policy with MET LIFE would be changing from the OTL or GUL policy, to a Group Variable Universal Life (GVUL) policy.

15. On or about March 15, 2000, MR. MILLER completed a Group Variable Universal Life Special Enrollment Change Form ("GVUL enrollment form"), as he was instructed to do in order to ensure that his life insurance coverage would continue.

16. Section 1 of the GVUL enrollment form is labeled "Smoker/ Non-Smoker Status Change." This section requires enrollees to select from the following status changes, "From Smoker to Non-Smoker" and "From Non-Smoker to Smoker." Smoker is defined on the form as "anyone who has used a tobacco product within the past 12 months. Tobacco use includes cigarettes, cigars, pipes, chewing tobacco and snuff." (See Exhibit "A"). As MR. MILLER has never been a smoker during the applicable periods, including the five-year look back periods, he logically left

this section blank, as the only two options did not apply to him because he was not changing his status.

17. MR. MILLER also left the sections labeled "Section 2 Pilots Life Insurance Coverage Change," "Section 3 Pilot's Extra Monthly Contribution Change," and "Section 5 Spouse's Extra Monthly Contribution Change" blank, because they also did not apply to him.

18. On or about March 22, 2000, MET LIFE received MR. MILLER's GVUL enrollment form. Soon thereafter, MET LIFE began to charge MR. MILLER on a monthly basis for the GVUL policy as a smoker per its apparently erroneous default policy when no change in smoking status box was selected on the GVUL enrollment form.

19. MET LIFE charged MR. MILLER the smoker rate at least since his coverage began under the GVUL policy.

20. From the time of his initial enrollment, MR. MILLER never received any notice or indication that he was being charged the smoker rate. This information was never provided in the annual policy statements MR. MILLER received, nor was it provided in any other communication MR. MILLER received from MET LIFE. It was not until recently, when MR. MILLER decided to reduce his GVUL policy coverage, that he determined he had been charged the smoker rate.

21. On or about October of 2016, MR. MILLER decided to change his GVUL policy coverage because he felt he no longer needed as much coverage as he had before. In order to change his coverage, MR. MILLER accessed his policy coverage through the MET LIFE Insurance link on the United Airlines Employee benefits website.

22. Once on the proper website MR. MILLER answered a variety of questions related to his personal life and the level of coverage he desired. When entering his personal information MR. MILLER was prompted to answer the question of "Have you smoked cigarettes, pipes, or cigars or used tobacco in any form in the past 5

years?" MR. MILLER selected "NO" for his response and then proceeded to fill out the rest of the online form.

23. Once the form was completed MR. MILLER was shocked to find, when looking at the price comparison, that his monthly premium should have been drastically lower than the current amount he had been paying for the last several years. MR. MILLER quickly called MET LIFE customer service to ensure he had filled out the online form correctly.

24. The MET LIFE customer service agent assured MR. MILLER he had correctly filled out the online form and the reduction in premium charges was due to the fact that MR. MILLER was changing his status to a non-smoker. MR. MILLER informed the agent that he was not a smoker and that he had never been one during the applicable periods, including the five-year look back periods. The agent then informed MR. MILLER that he had been labeled as a smoker for purposes of GVUL coverage since his enrollment back in March of 2000.

25. MR. MILLER was obviously shocked by this information and over the course of several months contacted various MET LIFE representatives, as well as union representatives from the ALPA to find out why he had been considered a smoker for GVUL purposes and how he could be refunded for the premium overcharges he had incurred for so many years.

26. On or about December 7, 2016, MR. MILLER received a letter from MET LIFE stating, "Metropolitan Life Insurance Company has processed your request to change to non-smoking rates. Your new monthly premium is $344.92... Your certificate was issued on June 1, 2000 **with smoker rates set as the default because you did not indicate your smoking status during the initial enrollment**. We cannot refund any premium difference that may have occurred back in time. A copy of your enrollment form is attached. Any other enrollment materials from 2000 are outside our document retention guidelines and no longer available." (See Exhibit "B")(Emphasis added).

27. As a comparison MR. MILLER's last pay stub before the non-smoker status was applied shows a deduction of $420.38 for his GVUL Employee coverage. The new monthly premium of $344.92 provides MR. MILLER with the exact same level of coverage he was receiving before. This amounts to a 19.7% overcharge in premium payments being incurred on a monthly basis.

28. MR. MILLER has paid his GVUL premium on time and in full, through an automatic deduction from his paycheck for the last 16 plus years. The GVUL coverage is based on a percentage of MR. MILLER's annual salary and as his salary has increased over the years, so has his GVUL coverage and thus his premiums.

29. At this time the exact amount of overcharges on the premiums is not known but the overcharges are substantial given that they have taken place over a 16 year period.

30. MR. BARTON recently learned from MR. MILLER that MET LIFE had been charging MR. MILLER smoker rates for his premiums on the GVUL policy, even though MR. MILLER had never been a smoker during the applicable periods, including the five-year look back periods.

31. After speaking to MR. MILLER, MR. BARTON became concerned that MET LIFE had also been charging him smoker rates for premiums on his own GVUL policy. For that reason, MR. BARTON looked up the premium rates he has been charged for his own GVUL policy with MET LIFE, to confirm whether this was true. MR. BARTON discovered he too has been charged smoker rates for the premiums on his own GVUL policy, even though he has never been a smoker during the applicable periods, including the five-year look back periods.

32. Mr. BARTON then requested multiple times to a MET LIFE representative that MET LIFE provide him with the GVUL enrollment form he would have filled out for enrollment in his own GVUL policy. In response to his multiple requests, MET LIFE has not agreed to provide MR. BARTON with a copy of his GVUL enrollment form.

33. In the event MET LIFE had asked MR. BARTON his status as a smoker or non-smoker, he would have indicated he was a non-smoker, as MR. BARTON was always a non-smoker during the applicable periods, including the five-year look back periods.

34. Upon information and belief, Plaintiffs allege MET LIFE overcharged similarly situated GVUL policy holders employed by United, by categorizing them as smokers if they failed to complete Section 1 of the GVUL enrollment form.

35. By accepting the GVUL enrollment form as completed by the enrollees and deducting the premium amount from the policy holders on a reccurring basis, MET LIFE entered into binding contracts with MR. MILLER, MR. BARTON, and members of the putative class.

36. At all times mentioned herein, MR. MILLER, MR. BARTON, and all those similarly situated relied on MET LIFE's acceptance of their original status as a non-smoker for purposes of the OTL or GUL and therefore, did not did not select a status change for Section 1 of their GVUL enrollment form.

37. By setting the smoker rate as the default when enrollees originally filed their status as a non-smoker on the OTL or GUL, MET LIFE breached its contracts with MR. MILLER, MR. BARTON, and members of the putative class. Furthermore, this action constitutes a fraudulent scheme by which MET LIFE overcharged policy holders based on a status it knew to be incorrect.

38. MET LIFE continues to breach its contracts with members of the putative class, and engage in a fraudulent scheme, by continuing to enforce, bill, and demand on a regular basis from policy holders a higher smoker rate premium for GVUL coverage, when, in fact, MET LIFE knew non-smoker status and applicable rates should apply.

## CLASS ACTION ALLEGATIONS

39. Plaintiffs MR. MILLER and MR. BARTON bring this action on behalf of themselves and all others similarly situated, as members of the proposed California

and Nationwide plaintiff class (collectively hereafter the "Class") defined as follows:

> **California Class**: All persons who resided in California at the time of the offer, or who currently reside in California, who entered into a contract with MET LIFE in response to a Group Variable Universal Life insurance offer in replacement of their Optional Term Life or Group Universal Life policy, wherein the enrollment form provided for a change in smoker status section which was left blank, and where MET LIFE charged smoker rates despite the class member's status under the prior Optional Term Life or Group Universal Life policy being that of a non-smoker.
>
> **Nationwide Class**: All persons who resided in the United States at the time of the offer, who entered into a contract with MET LIFE in response to a Group Variable Universal Life insurance offer in replacement of their Optional Term Life or Group Universal Life policy, wherein the enrollment form provided for a change in smoker status section which was left blank, and where MET LIFE charged smoker rates despite the class member's status under the prior Optional Term Life or Group Universal Life policy being that of a non-smoker.

Specifically excluded from the proposed Classes are Defendants, any entities in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, successors, subsidiaries and/or assigns of Defendants, and any Judge who may be assigned to this matter.

40. This action is brought and may be properly maintained as a class action pursuant to the provisions of Federal Rule of Civil Procedure 23(a)(1)-(4) and 23(b)(1)-(3). This action satisfies the numerosity, typicality, adequacy, predominance and superiority requirements of those provisions.

41. [Fed. R. Civ. P. 23(a)(1)] The Class is so numerous that the individual joinder of all of its members is impractical. While the exact number and identities

of Class members are unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs are informed and believe the Class includes many thousands of members.

42. [Fed. R. Civ. P. 23(a)(2)] Common questions of fact and law exist as to all members of the Class which predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to, the following:

    A. Whether Defendants entered into valid contracts with members of the Class;

    B. Whether the terms of the contracts are governed by the smoker status that members of the putative Class declared on their Optional Term Life or Group Universal Life policy;

    C. Whether Defendants breached the contracts with the Class when it charged the payment of premiums based on the smoker rate being set as the default when no status change was selected on the Group Variable Universal Life Special Enrollment Change Form;

    D. Whether Defendants committed fraud through charging smoker rates to individuals which it knew or should have known were to be treated as non-smokers; and

    E. The nature and extent of damages and other remedies to which the conduct of Defendants entitles the Class members.

43. [Fed. R. Civ. P. 23(a)(3)] Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have sustained injury and are facing harm arising out of Defendants' common course of conduct as complained of herein. The losses of each member of the Class were caused directly by Defendants' wrongful conduct as alleged herein.

44. [Fed. R. Civ. P. 23(a)(4)] Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including complex consumer and mass tort litigation.

45. [Fed. R. Civ. P. 23(b)(3)] A class action is superior to other available methods of fair and efficient adjudication of this controversy, since individual litigation of the claims of all Class members is impracticable. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous issues would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same complex factual issues. By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented herein, presents fewer management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each Class member.

46. [Fed. R. Civ. P. 23(b)(1)(A)] The prosecution of separate actions by thousands of individual Class members would create the risk of inconsistent or varying adjudications with respect to, among other things, whether a valid contract existed, and if so, the terms of such contract.

47. [Fed. R. Civ. P. 23(b)(1)(B)] The prosecution of separate actions by individual class members would create a risk of adjudications with respect to them that would, as a practical matter, substantially impair or impede the ability of such non-party Class members to protect their interests.

48. [Fed. R. Civ. P. 23(b)(2)] Defendants have acted or refused to act in respects generally applicable to the Class, thereby making appropriate final and injunctive relief with regard to the members of the Class as a whole.

# CLAIMS FOR RELIEF

# FIRST CLAIM FOR RELIEF

## (Breach of Contract)

## By Plaintiffs and Putative Class Against All Defendants)

49. Plaintiffs and the Class incorporate by reference each preceding paragraph as though fully set forth herein.

50. Plaintiffs and the Class entered into contracts with MET LIFE for life insurance, pursuant to the terms and conditions of MET LIFE's Optional Term Life (OTL) or Group Universal Life (GUL) policy and MET LIFE's Group Universal Variable Life (GVUL) policy offers.

51. Specifically, the GVUL policy enrollment form provided for a smoker status change only, and without such change, the smoker status should have been determined by the status originally applied for under the OTL or GUL policy.

52. Plaintiffs and the Class members performed all material terms required to accept the offer by completing all sections of the GVUL enrollment form that applied and returning the GVUL enrollment form to MET LIFE.

53. Plaintiffs and the Class members performed all material terms required by the contracts by making monthly premium payments.

54. Defendants breached the contracts when it charged Plaintiffs and the Class members smoker rates when they should have been charged non-smoker rates. This breach occurred even though Defendants knew or should have known the status of Plaintiffs and the Class members to be non-smokers based on their OTL or GUL coverage.

55. Defendants continue to breach the contracts by, on a monthly basis, requiring the Class members to continue to make premium payments at higher rates based on the defaulted smoker status and continue to deny repayment of past overcharges.

56. As a result of the foregoing, Plaintiffs and the Class members have been damaged in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### (Fraud)

### (By Plaintiffs and Putative Class Against All Defendants)

57. Plaintiffs and the Class incorporate by reference each preceding paragraph as though fully set forth herein.

58. Upon information and belief, MET LIFE concealed and suppressed material facts concerning the policy status of Plaintiffs and Class members when their policy was changed from OTL or GUL to GVUL, and charged Class members smoker rates when they should have been charged non-smoker rates. Defendants accomplished their scheme by establishing an internal policy of designating as smokers those individuals who left blank the smoker status change section of the GVUL enrollment form, even though they knew or should have known that such policy would result in overcharging Plaintiffs and Class members as smokers when their original status was as a non-smoker.

59. MET LIFE ensured that the details of the fraudulent scheme would not be revealed to their insureds by failing to disclose each insured's smoker status in any annual policy report or statement. MET LIFE engaged in this fraudulent concealment at the expense of Plaintiffs and Class members.

60. Plaintiffs and Class members reasonably relied on MET LIFE's deceptive conduct and paid the overcharges as automatic deductions from their paychecks. Plaintiffs and Class members had no way of discerning the fraud absent taking the extraordinary step to check whether their paycheck deduction actually matched the amount that was listed on MET LIFE's policy rate tables or by calling the company to check their status.

61. Plaintiffs and Class members were not aware of the concealed and misrepresented material facts referenced above, and would not have acted as they did had they known the truth regarding their premium payments.

62. As a direct and proximate result of Defendants' fraudulent scheme, Plaintiffs and Class members sustained damages. They significantly over paid for premiums associated with their MET LIFE GVUL insurance coverage.

63. Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

64. Moreover, because Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiffs and Class members for the purpose of enriching themselves at Plaintiffs' and Class members' detriment, Defendants' conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, each individually and on behalf of all other persons similarly situated, pray for judgment against MET LIFE as follows:

1. An Order certifying the Class and any sub-classes thereof that the Court may deem appropriate, and appointing Plaintiffs DALE MILLER and JOHN F. BARTON, JR., and their counsel, to represent the Class;

2. An award of general damages according to proof;

3. Injunctive relief;

4. Attorneys' fees;

5. Exemplary and punitive damages;

6. Costs of suit; and

7. Any other relief the Court deems proper.

DATED: April 7, 2017

Respectfully submitted,

KIRTLAND & PACKARD LLP

By: /s/ Joshua A. Fields
MICHAEL L. KELLY
BEHRAM V. PAREKH
JOSHUA A. FIELDS

*Counsel for Plaintiff Dale Miller, John F. Barton, Jr., and all others similarly situated.*

# **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury as to all claims so triable.

DATED: April 7, 2017

Respectfully submitted,

KIRTLAND & PACKARD LLP

By: /s/ Joshua A. Fields
MICHAEL L. KELLY
BEHRAM V. PAREKH
JOSHUA A. FIELDS

*Counsel for Plaintiff Dale Miller, John F. Barton, Jr., and all others similarly situated.*